**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 21-cv-01152-CMA-NRN

ANDREW DOSA KIM,

      Plaintiff,

v.

CHLOE KETTELL,
PARTHA RAY,
MICHAEL SHULL, and
POLYPORT, INC.,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on (1) Defendant Chloe Kettell, Partha Ray, and

PolyPort, Inc.'s ("Moving Defendants")[1] Motion for Summary Judgment (Doc. # 78), and

(2) Plaintiff Andrew Dosa Kim's Motion for Summary Judgment (Doc. # 79). For the

following reasons, the Court dismisses Mr. Kim's Correction of Inventorship claim as it

relates to Patent Application Number 16/926,991 ("the '991 Application"), grants in part

and denies in part Moving Defendants' Motion, and grants in part and denies in part Mr.

Kim's Motion.

---

[1] Defendant Michael Shull is not a party to Moving Defendants' Motion. (Doc. # 78.) Despite a
clerk's entry of default against Mr. Shull (Doc. # 50), Mr. Kim seeks judgment as a matter of law,
rather than default judgment, against Mr. Shull. (Doc. # 79 at 1.)

# I.    BACKGROUND

## A.    FACTUAL BACKGROUND[2]

This case arises from a dispute amongst cofounders of a technology start up. Ms. Kettell and Mr. Ray have been romantically involved since approximately 2015. (Doc. # 79-1 at 55.)[3] About a year into their relationship, they met Mr. Kim who had previously been working on a way to protect three-dimensional ("3D") digital assets he created by hiding—underneath or within those creations—a type of artist's signature created from polygons. (Doc. # 78-1 at 31–34; Doc. # 79-1 at 52, 55.) Mr. Kim described this process to Mr. Ray who responded that it could be used to encrypt—and thereby protect—3D assets. (Doc. # 78-1 at 34; Doc. # 79-1 at 52.) Mr. Ray had previously been engaged in encryption, asset protection, and coding. *See* (Doc. # 78-1 at 34, 37–39.) Together, Mr. Kim, Mr. Ray, and Ms. Kettell cofounded Padeca, LLC ("Padeca"), with the vision of developing a product or service for protecting digital 3D assets. (Doc. # 79-1 at 58, 82–89, 247.)

Padeca was incorporated as a Wyoming limited liability company ("LLC") on May 2, 2016. (*Id.* at 69, 78–79.) An unsigned operating agreement dated June 13, 2016, indicates that the three cofounders originally agreed to equal shares of one-third (one million units) each in the company. (*Id.* at 83); *see also* (Doc. # 78-1 at 718.) This

---

[2] The Court draws the following facts from the parties' Motions and attachments thereto. The facts are undisputed unless otherwise indicated.

[3] The Court cites to the docket number (*e.g.*, Doc. # 100) and the page number applied by the court docketing system in blue in the header of each document (*e.g.*, Doc. # 100 at 30).

operating agreement also allowed for amendment "by Managing Members [defined as Ms. Kettell, Mr. Ray, and Mr. Kim,] of the Company holding by [sic] SIXTY-FIVE (65%) PERCENT of the outstanding membership Units," and vested "[t]itle to the Assets" in Padeca. (Doc. # 79-1 at 84, 86.) "Assets" is not defined in the agreement.

On July 4, 2016, the three Padeca Cofounders filed a provisional patent application entitled "Method of File Internal 3D Object Encryption by Application of Multi-Layered Cloud Based Encryption with Integrated File Asset Tracking." (*Id.* at 5–9.)[4] This patent application named all three cofounders. Mr. Ray alleges that Defendants eventually "completely scrapped" this patent application "to develop a marketable product out of the broad ideas." (Doc. # 78 at 4); *see also* (Doc. # 78-1 at 594–603.)

About six months after Padeca was founded, a software developer, Defendant Michael Shull, who had previously worked with Mr. Ray, was brought in to assist with developing the code necessary to bring Padeca's concept to fruition. (Doc. # 78-1 at 273, 277–78; Doc. # 79-1 at 60.) Mr. Kim knows enough about coding to "get [him] in trouble" but is not proficient in any coding language. (Doc. # 78-1 at 24–25.) At some point, this team of four started referring to the product they were developing and/or their company as "D3CRYPT3D."

On March 14, 2017, this team of four won the South-by-Southwest ("SXSW") Interactive Innovation Award for Privacy and Security for its D3CRYPT3D software.

---

[4] The Court notes that the evidence cited in support of this fact is an undated draft application which does not indicate when, if ever, it was filed. However, because the parties agree that a provisional patent application of the same title was filed on July 4, 2016, the Court construes this as an undisputed fact. (Doc. # 79 at 3; Doc. # 81 at 2.)

(Doc. # 79-1 at 92.)[5] During this period and following the award, a flurry of activity relevant to this litigation began. Following the SXSW award, Mr. Ray began working on provisional patent applications 62/506,347 and 62/508,520, which were filed on May 15, and May 19, 2017, respectively. (*Id.* at 76–77); *see also* (*id.* at 95.) Although Mr. Kim continued to be involved with the company and, at the time these provisional applications were filed, he was working on and contributing to the inventive concepts later disclosed in United States Patent number 10,713,388 B2 ("the '388 Patent"), Mr. Kim was unaware of these filings. (*Id.* at 165–66, 127–28, 140.)[6] The '388 Patent, issued on July 14, 2020, naming Mr. Ray and Mr. Shull as inventors, lists these provisional applications as "related" applications. (*Id.* at 95.)

Following the SXSW award, Padeca as an entity went through several changes. It appears that several corporate documents were drafted including (1) a Proprietary Information and Inventions Assignment Agreement ("PIIAA"), signed by Ms. Kettell and dated "May __, 2017" (Doc. # 78-1 at 904–12), (2) a Founder Unit Restriction

---

[5] The Court notes that the photograph establishing this fact appears to have been posted to social media on March 16, 2017. (Doc. # 79-1 at 92.) However, the parties agree that the award was won on March 14, 2017, therefore the Court construes this as an undisputed fact. (Doc. # 79 at 3; Doc. # 81 at 2.)

[6] The evidence contained at Doc. # 79-1 pages 116 to 148 is a transcript of a Skype call between Ms. Kettell and several unidentified "Speaker[s]" appearing to include Mr. Kim and others involved with the D3CRYPT3D software. (Doc. # 79-1 at 116–48.) There is no date on this evidence. (*Id.*) The Court notes that Mr. Kim's Motion (Doc. # 79 at 13) and his Response to Moving Defendants' Motion (Doc. # 83 at 10) assert this call occurred on March 16, 2017. This appears to be a typo because in each instance Mr. Kim describes the call as occurring "one day after PolyPort filed U.S. Provisional Application No. 61/506,347" (Doc. # 79 at 13; Doc. # 83 at 10) which would put the correct date as May 16, 2017. *See* (Doc. # 79-1 at 95); *see also* (Doc. # 86 at 7.)

Agreement ("FURA"), signed by Ms. Kettell and allegedly by Mr. Kim, dated "May __,

2017" (*id.* at 916–25), (3) a Unanimous Joint Written Consent of the Members and

Managers of Padeca, LLC for the conversion of Padeca to a Delaware LLC known as

D3CRYPT3D, signed by the three cofounders and dated May 18, 2017 (*id.* at 838–42),

and (4) an Amended and Restated Operating Agreement for D3CRYPT3D ("AROAD"),

LLC, signed by Ms. Kettell and dated "May __, 2017" (Doc. # 79-1 at 174–214). On

June 28, 2017, Padeca, LLC was transferred to a Delaware LLC known as

D3CRYPT3D. (Doc. # 78-1 at 843–47); *see also* (*id.* at 834–36.) Corporate Defendant

PolyPort, Inc. ("PolyPort") was incorporated in Delaware on July 5, 2017. *See* (Doc. #

79-1 at 172.)

On July 5, 2017, the AROAD, allegedly signed by all three cofounders, went into

effect. (Doc. # 78-1 at 863–903.) Mr. Kim asserts that he saw the FURA and AROAD for

this first time during his deposition for this litigation on July 25, 2022. (Doc. # 79-1 at

168, 283.) Although he acknowledges that his signature appears on these documents,

he asserts he did not sign the FURA and does not recall signing the AROAD. (*Id.*)

Accordingly, the parties genuinely dispute whether Mr. Kim signed these documents

and whether they are valid.

The AROAD contains the following provision related to Ownership in Intellectual

Property:

> Each Member hereby agrees and acknowledges that all ideas, processes,
> trademarks, service marks, inventions, designs, technologies, computer
> hardware or software, original works of authorship, formulas, discoveries,
> patents, copyrights, copyrightable works products, marketing and business
> ideas, and all improvements, know-how, data, rights, and claims related to
> the foregoing that, whether or not patentable, are created, developed or

conceived by them and which (a) [sic] relate to the Company's current or contemplated business or activities, (2) relate to the Company's actual or demonstrably anticipated research or development, (3) result from any work performed by them for the Company (whether before or after the date of this Agreement), (4) involve the use of the Company's equipment, supplies, facilities or trade secrets, (5) result from or are suggested by any work done by the Company or at the Company's request, or any projects specifically assigned to them, or (6) result from their access to any of the Company's memoranda, notes, records, drawings, sketches, models, maps, customer lists, research results, data, formulae, specifications, inventions, processes, equipment or other materials (collectively, "**Work Product**") shall be exclusively owned by Company, and where applicable, all Work Product shall be considered "works made for hire" for purposes of the United States Copyright Act. In the event that any Work Product shall be deemed not to constitute works made for hire, or in the event that a Member should otherwise, by operation of law, be deemed to retain any rights (whether moral rights or otherwise) to any Work Product, each Member agrees to assign to the Company, and hereby irrevocably assigns to the Company, without further consideration, his or her entire right, title and interest in, to and under all Work Product, including, without limitation, all worldwide copyrights, patent rights, trademark and trade dress rights and other proprietary rights therein and all applications or registrations (including continuations thereof) relating thereto. Without limiting the foregoing, each Member also hereby waive [sic] and relinquish [sic] any claims of "moral rights" or "droit moral" relating to the Work Product. Each Member agrees to execute and deliver any documents and take such further measures as are reasonably requested by the Company from time to time to record, perfect and/or enforce the Company's rights in the Work Product.

(Doc. # 78-1 at 893–94.) The PIIAA contains similar language. (*Id.* at 906.) Further,

although each of the three cofounders still holds 1,000,000 common units in

D3CRYPT3D, under the AROAD those units are now "[s]ubject to vesting and other

restrictions as provided in [the FURA]." (*Id.* at 902.) The FURA, in turn, gave

D3CRYPT3D the option to repurchase up to 900,000 of Mr. Kim's shares (the

"Unvested Units"), in the event of his involuntary termination. (*Id.* at 916–17); *see also*

(*id.* at 718–23.)

Finally, Mr. Ray testified during his deposition that conflicts between Mr. Kim and the rest of the team began to arise in the period immediately preceding and following the SXSW award. (Doc. # 79-1 at 62–63.) As a result, following the award, he and Ms. Kettell held one or more Board Meetings and sought the advice of counsel to discuss options relating to Mr. Kim's continued involvement with D3CRYPT3D. (*Id.* at 63, 65.) Although it was "typical" of the cofounders to put notice of meetings in their Slack chat accessible by everyone working at the company (*id.* at 63), Mr. Kim was not notified of these meetings beforehand. (*Id.* at 63, 65.) At one point, Mr. Kim was presented with an advisor agreement, which he rejected. (*Id.* at 65.)

On or around August 6, 2017, Mr. Kim was presented with a Unit Repurchase Notice—signed by Ms. Kettell—which informed him that D3CRYPT3D was "repurchasing from [him] 900,000 unvested Common Units of the Company" at a price of $0.0061 per Unit for a total of $5,490. (Doc. # 79-1 at 217–18.)[7] Moving Defendants assert that Mr. Kim accepted the compensation provided with this repurchase agreement. (Doc. # 78 at 15 (citing Doc. # 78-1 at 937–40.)) However, Mr. Kim counters that although he did receive the Notice, he did not sign it and did not sign the accompanying "check that was addressed to him and later deposited." (Doc. # 79 at 30.) Mr. Kim retains an ownership interest of 100,000 shares in PolyPort. (Doc. # 78-1 at 941.)

---

[7] The Court notes that the evidence cited in support of this fact does not contain a date. However, because the parties agree that the Unit Repurchase Notice was presented to Mr. Kim on or around August 6, 2017, the Court construes this as an undisputed fact. (Doc. # 79 at 7; Doc. # 81 at 4.)

**B.      PROCEDURAL HISTORY**

Mr. Kim initiated this action on April 27, 2021. (Doc. # 1.) The operative First Amended Complaint asserts claims for (1) Correction of Inventorship for the '388 Patent and the '991 Application, (2) Unjust Enrichment, (3) Breach of Contract against Moving Defendants, (4) Breach of the Covenant of Good Faith and Fair Dealing against Moving Defendants, (5) Breaches of Fiduciary Duties against Moving Defendants, (6) Misappropriation of Business Ideas against all Defendants, (7) Intentional Infliction of Emotional Distress ("IIED") against Ms. Kettell and Mr. Ray, (8) Aiding and Abetting Breach of Fiduciary Duty against Mr. Shull and PolyPort, and (9) Declaratory Judgment that Mr. Kim is the owner of 33% of PolyPort, Inc. (Doc. # 17 at ¶¶ 70–140.)

Mr. Kim and Moving Defendants initially filed cross Motions for Summary Judgment on all claims on September 1, 2022. (Docs. ## 56, 58.) The Court granted a Stipulated Motion to Strike and Notice of Errata (Doc. # 67) on October 3, 2022, allowing the parties to replace Moving Defendants' Motion for Summary Judgment and several related briefs. (Doc. # 68.) On January 31, 2023, the Court then struck both parties Motions and all related briefs for failure to comply with the Court's practice standards. (Doc. # 77.) Pursuant to this Order, the parties refiled their cross Motions for Summary Judgment on February 14, 2023. (Docs. # 78–79.) Noting the five potential states with relationships to the state law claims and the minimal or absent briefing on choice of law, on March 29, 2023, the Court ordered both parties to file simultaneous supplemental briefing regarding which states' laws applied. (Doc. # 87.) The Court directed parties to "make their arguments—pursuant to [the states' laws they had

deemed applicable to each claim]—as to why summary judgment should be granted as to that individual claim." (*Id.* at 2.) On April 12, 2023, the parties filed a Joint Brief Regarding Choice of Law stipulating to the application of Delaware law to Mr. Kim's state law claims. (Doc. # 89.) However, this brief did not apply Delaware law to the parties' arguments for summary judgment. Therefore, following a short, requested stay while the parties discussed settlement (Docs. ## 88–89), the Court again ordered the parties to file simultaneous supplemental briefing in which they applied the stipulated-to Delaware law to all the state law claims at issue in their cross motions for summary judgment. (Doc. # 93.) Mr. Kim and Moving Defendants complied with this Order (Docs. ## 94–97) and both Motions are now fully briefed. (Docs. ## 81, 83, 85–86, 89, 94–97.)

## II.    LEGAL STANDARDS

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbot Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 118 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for summary judgment, a court may not resolve issues of credibility, and must view the evidence in the light most favorable to the nonmoving party—including all reasonable inferences from that evidence. *Id.* However, conclusory statements based merely on

conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id*. In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claims; rather, the movant need simply point the court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant meets its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy this burden. *Id*. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence from which a rational trier of fact could find for the nonmoving party." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*. Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III.   **DISCUSSION**

### A.   **CORRECTION OF INVENTORSHIP**

Mr. Kim's Correction of Inventorship claim falls under federal patent law. 35 U.S.C. § 256; *HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co.*, 600 F.3d 1347, 1353 (Fed. Cir. 2010) ("[I]nventorship is a unique question of [federal] patent law"); *Bd. of Regents, Univ Tex. Sys. v. Nippon Tel. & Tel.*, 414 F.3d 1358, 1363 (Fed. Cir. 2005) ("[T]his court has held that issues of inventorship, infringement, validity and enforceability present sufficiently substantial questions of federal patent law"); *see also* (Doc. # 94 at 3–4.)

### 1.   The '991 Application

As an initial matter, Mr. Kim brings his Correction of Inventorship claim related to both the '388 Patent and the '991 Application. (Doc. # 17 at ¶¶ 71–73.) Pursuant to 35 U.S.C. § 256(b), a district court "may order correction of [a] patent on notice and hearing of all parties concerned and the [United States Patent and Trademark Office ("USPTO")] Director shall issue a certificate accordingly." However, as it relates to pending patent applications, 35 U.S.C. § 116 "authorizes the Director of the [USPTO] to take certain actions concerning pending patent applications, but 'plainly does not create a cause of action in the district courts to modify inventorship on pending patent applications.'" *HIF Bio*, 600 F.3d at 1353 (quoting *Eli Lilly Co. v. Aradigm Corp.*, 376 F.3d 1352, 1356 n.1 (Fed. Cir. 2004)). Where the inventorship of a patent application is at issue, therefore, district courts must dismiss the claim under Federal Rule of Civil Procedure 12(b)(6) due to the fact that no private right of action exists. *Id.* at 1347. Because the Court has

no power to determine inventorship with respect to patent applications, the Court dismisses this claim as it relates to the '991 Application.[8]

2. <u>The '388 Patent</u>

a. *Standing*

Turning to the '388 Patent, Moving Defendants first argue that Mr. Kim lacks standing to challenge the Patent's inventorship because he assigned all interests in intellectual property to Padeca and its successors. (Doc. # 78 at 4–5; Doc. # 81 at 5 (citing *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009).) Mr. Kim counters that he has ownership and reputational interests in the '388 Patent. (Doc. # 78 at 8–10.) Further, Mr. Kim asserts that his case is distinguishable from *Larson* because he was a founder—rather than an employee—of Padeca, and therefore has ownership interests in the '388 Patent by means of his ownership interests in Padeca's successor PolyPort. (*Id.* at 9; Doc. # 86 at 5.)

In the context of a correction of inventorship case, reputational interest alone may be sufficient to satisfy the requirements of Article III standing because both inventors and the public stand to benefit from assuring correct inventorship designations on patents. *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1358–59 (Fed. Cir. 2001). Further, concrete financial interests in a patent, even where less than ownership, are sufficient to establish standing. *Id.* at 1359. However, where a plaintiff has assigned all his patent rights, and does not stand to reap any benefit—for example from preexisting

---

[8] The Court also notes that the parties' motions and briefing contain no facts, disputed or undisputed, regarding the '991 Application. *See generally* (Docs. ## 78–79, 81, 83, 85–86.)

licensing or royalty agreements—from his correction of inventorship claim, standing is lacking. *Larson*, 569 F.3d at 1326–27.

In support of their standing argument, Moving Defendants point to the ownership in intellectual property provisions in the AROAD dated July 5, 2017 (Doc. # 78-1 at 893–94), and the PIIAA (*id*. at 904–11).[9] As discussed above, the parties dispute the validity of the AROAD and whether Mr. Kim signed the document himself. (Doc. # 79-1 at 167–68, 283.) The PIIAA does not bear Mr. Kim's signature at all. (Doc. # 78-1 at 911.) However, even if the AROAD is valid, Mr. Kim has a concrete financial interest in the patent. This is because, pursuant to the Ownership in Intellectual Property provision of the AROAD, the patent would be owned by PolyPort. (*Id.* at 893–94.) Mr. Kim's ownership interest in PolyPort, therefore, (*id*. at 941), would infer in him a financial interest—even if less than full ownership—in the patent. Accordingly, although genuinely disputed, the validity of the AROAD is not material to determining Mr. Kim's standing to bring his Correction of Inventorship claim. *Chou*, 254 F.3d at 1358–59.

        *b.*     *Relevant Law on the Merits*

Next, the parties disagree as to whether Mr. Kim's contributions to the technology protected by the '388 Patent are sufficient to establish him as a co-inventor. Section 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997). This includes the

---

[9] Moving Defendants also point to a letter, authored by their attorney, explaining their understanding of the standing issue. This letter asserts similar legal arguments as Moving Defendants' briefs and is not proof thereof.

situation of "nonjoinder"—"the error of omitting an inventor" from a patent. *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1358 (Fed. Cir. 2019).

"Conception is the touchstone of inventorship." *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001). Therefore, "a joint inventor must contribute to the invention's conception." *CODA Dev.*, 916 F.3d at 1358. Conception is complete "when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation." *Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994). In contrast, actual reduction to practice consists of constructing an embodiment that meets all the limitations of a claim. *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998); *see also* MPEP § 2109 (9th ed. Rev. Feb. 2023) ("Insofar as defining an inventor is concerned, reduction to practice*, per se*, is irrelevant.").

"The determination of whether a person is a joint inventor is fact specific." *Fina Oil*, 123 F.3d at 1473. "[A] party alleging . . . non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence." *Eli Lilly*, 376 F.3d at 1358. A plaintiff's testimony regarding his or her own inventorship claim "is regarded with skepticism," *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993), and "cannot, standing alone, rise to the level of clear and convincing proof." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998). Thus, a plaintiff "must provide evidence to corroborate the alleged joint inventor's conception." *Eli Lilly*, 376 F.3d at 1358. "Physical, documentary, or circumstantial evidence, or reliable testimony from individuals other than the alleged inventor or an interested party, may corroborate" a

plaintiff's testimony. *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1339 (Fed. Cir. 2005).

> ### c.    Application

The parties agree that the idea of protecting digital 3D assets originated with Mr. Kim, that Mr. Ray possessed the experience and expertise related to encryption, and that Mr. Shull was brought on to develop the software. (Doc. # 78-1 at 31–34, 37–39, 58, 1046; Doc. # 79-1 at 5–9, 11–17, 52, 58, 133); *see also* (Doc. # 78 at 2–3; Doc. # 79 at 2–4; Doc. # 81 at 1–3; Doc. # 83 at 2.) The parties also agree that Mr. Kim lacks sufficient coding knowledge to develop software and that Mr. Kim does not know which coding language was used to develop the software underlying the '388 Patent. (Doc. # 78-1 at 24–25, 37–38, 126–27.) Most importantly to the Court, Moving Defendants admit that Mr. Kim "was still working on and contributing to the inventive concepts disclosed in the '388 [P]atent at the time the provisional applications were filed." (Doc. # 79 at 4; Doc. # 81 at 3); *see also* (Doc. # 79-1 at 127–28, 140, 165–66.)

Further, although Moving Defendants allege that the software Mr. Kim worked on was "scrapped . . . to develop a marketable product out of the broad ideas," (Doc. # 78 at 7), Mr. Ray's deposition testimony does not clearly support this assertion. Mr. Ray testified:

> [I]f we talk about the – the products that PolyPort were working on in their last two and a half years after we completely scrapped everything, that's a wholly separate set of software and services that do not deal with anything to do with the patent or deal with anything of the mechanics that we use before in D3CRYPT3D or [the] first version of PolyPort.

(Doc. # 78-1 at 609.) Yet, whether PolyPort's post-2020 work is "a wholly separate set of software and services" is irrelevant to the issue of whether Mr. Kim should have been named as an inventor on the '388 Patent, provisional applications for which were filed in 2017. *See* (Doc. # 79-1 at 95.) Finally, Mr. Kim has pointed to evidence beyond his own testimony that acknowledges his contribution to the conception of the D3CRYPT3D software. (Doc. # 79-1 at 127–28, 133,140); *see also* (Doc. # 79-1 at 5–9, 11–17, 95–114.)

Therefore, the undisputed material facts establish that Mr. Kim "contributed to the invention [protected by the '388 Patent]'s conception." *CODA Dev.*, 916 F.3d at 1358. Mr. Kim may not have reduced the conception to practice—in other words, he may not have developed the software himself—but that is not relevant to the question of whether he should be named as a co-inventor. *Cooper*, 154 F.3d at 1327; MPEP § 2109. Accordingly, the Court grants Mr. Kim's Motion (Doc. # 79) and denies Moving Defendants' Motion (Doc. # 78) as it relates to the Correction of Inventorship claim.

## B.   UNJUST ENRICHMENT

Mr. Kim's next seven claims are all state law torts, contracts, and corporations claims. (Doc. # 17 at ¶¶ 74–137.) The parties have stipulated that pursuant to Padeca's transfer to a Delaware LLC on or about June 27, 2017, (Doc. # 78-1 at 843–47); *see also* (*id.* at 834–36), as well as Defendant PolyPort's incorporation in Delaware, (Doc. # 79-1 at 172), Delaware law applies to these claims. (Doc. # 89.)

Mr. Kim's unjust enrichment claim, brought against all Defendants, centers around Defendants' retention of rights to the '388 Patent, which was "utilized in efforts to

raise startup capital totaling $2,700,000" (Doc. # 79 at 15 (citing Doc. # 79-1 at 265)), resulting in "loss of business opportunities[,] money[,] emotional trauma[,] and health risks" (Doc. # 17 at ¶¶ 79–83). Further, Mr. Kim asserts that, by "fraudulently divesting [him] of [900,000] shares in PolyPort," Defendants unjustly received the benefits of "PolyPort's capitalization on the ideas, innovation, sweat equity, and contributions made by Mr. Kim," as well as the ability to control the company through retention of a supermajority voting interest. (Doc. # 96 at 2–3.)

       a.    *Preemption*

Defendants first argue that Plaintiff's claim is preempted by federal law because it conflicts with Congress's intention to endow each patent co-owner with the independent right to license or sell the invention. (Doc. # 94 at 4); *see also* (Doc. # 78 at 10; Doc. # 81 at 7–8; Doc. # 85 at 7.) "Federal Circuit law governs whether federal patent law preempts a state law claim." *Tavory v. NTP, Inc.*, 297 F. App'x 976, 892 (Fed. Cir. 2008). "An unjust enrichment claim is preempted by federal patent law when it conflicts with 'the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)).

Under 35 U.S.C. § 262, "[i]n the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." Thus, "any of the co-owners of the patents-in-suits may license the patents-in-suit without obtaining the approval of, or accounting to, the other co-owners." *Tavory*, 297 F. App'x at 982–83.

"When one patent co-owner transfers his own interest in a patent to a third party, § 262 preempts any unjust enrichment claim brought by another co-owner seeking to disgorge a portion of the proceeds resulting from that transfer." *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1078 (N.D. Cal. 2009) (citing, *Tavory*, 297 F. App'x at 982–83). This is because such unjust enrichment claims conflict with the purpose of § 262, "which provides that a patent co-owner may transfer his own interest in a patent without the consent of, and without any accounting to, the other co-owners." *Id.*

However, the instant case does not involve the sale, transfer or licensing of a patent. Thus, Section 262 does not speak to the conduct alleged in this case. Accordingly, the Court concludes that Moving Defendants have not established that Mr. Kim's unjust enrichment claim conflicts with federal patent law.

Finally, in their response (Doc. # 97) to Mr. Kim's Supplemental Brief Regarding Choice of Law, Moving Defendants raise for the first time the argument that Mr. Kim's unjust enrichment claim is also preempted by Delaware's Uniform Trade Secrets Act ("DUTSA"), 6 Del. C. § 2001 *et seq.* (Doc. # 97 at 2–3.) The Court will not address this argument as Mr. Kim was not permitted an opportunity to reply. *See* (Doc. # 93.) Moving Defendants had more than four previous opportunities to raise this argument but did not. *See* (Docs. ## 77–78, 81, 85, 94.)

    *b.*    *Merits*

Turning to the merits of Mr. Kim's claim, under Delaware law, unjust enrichment is a cause of action based on the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of

justice or equity or good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). In determining whether to award a remedy based on unjust enrichment, courts look for proof of the following elements: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law. *Id*.

Moving Defendants argue that they are entitled to summary judgment in their favor because they have not retained a benefit and there is no evidence of unjust circumstances. (Doc. # 78 at 9–10.) In support, they point to Mr. Kim's continued ownership of 100,000 shares in PolyPort and the compensation he was provided pursuant to the AROAD, FURA, and Unit Repurchase Notice. (*Id.* at 10 (citing Doc. # 78-1 at 916–25, 935–941.)) For his part, Mr. Kim argues the Court should enter summary judgment in his favor because the evidence establishes that (1) Ms. Kettell and Mr. Ray have received compensation for their work with PolyPort, and PolyPort itself has received $2,700,000 in startup capital, and (2) these benefits were received by means of Mr. Kim's ousting from the company without justification (Doc. # 79 at 15–17 (citing Doc. # 79-1 at 217–18, 264–67);[10] Doc. # 83 at 12–13 (citing Doc. # 79-1 at 65; Doc. # 83-1 at 282–84); Doc. # 95 at 1–3.)

However, the parties dispute whether Mr. Kim agreed to the AROAD and FURA and whether he signed the check for the repurchased shares. (Doc. # 79 at 30; Doc. #

---

[10] Mr. Kim also cites Doc. # 79-1 at 275–79 described as a Capitalization Table of PolyPort. (Doc. # 79 at 16.) However, this document is completely redacted and, although it states it was filed separately under level 1 restriction (Doc. # 79-1 at 268), no such document appears on the docket.

79-1 at 167–68, 283.) Therefore, there are genuine disputes of material fact precluding summary judgment on Mr. Kim's unjust enrichment claim and the Court will accordingly deny both motions as they relate to this claim.

## C.   BREACH OF CONTRACT

Under Delaware law, a party asserting a claim for breach of contract must show: (1) the existence of a contractual obligation, (2) a breach of that obligation by the defendants, and (3) resultant damage to the plaintiff. *Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672, 686 (D. Del. 2013). Although it is unsigned, the parties do not contest the validity of the Padeca operating agreement. (Doc. # 79-1 at 61, 82–89, 167); *see also* (Doc. # 79 at 2–3; Doc. # 81 at 2.) The parties do dispute, however, whether that operating agreement had been amended—by the AROAD—prior to the alleged breach. (Doc. # 78-1 at 719, 863–903; Doc. # 79-1 at 167–68, 283.)

Mr. Kim asserts that the original Padeca operating agreement was breached by Mr. Ray and Ms. Kettell when they failed to provide Mr. Kim with notice of Board meetings at which they discussed Mr. Kim's continued involvement with D3CRYPT3D, ultimately leading to his ousting from the company's leadership. (Doc. # 95 at 3–4; Doc. # 96 at 4 (citing Doc. # 79-1 at 63, 65).) Moving Defendants counter that even if the Padeca operating agreement was the operative contract at the time, they did not breach the contract because it allowed amendment with approval of 65% of the membership interests and because "there was no requirement for notice of meetings, and these were largely convened informally, and there is no requirement for a quorum." (Doc. # 81 at 9; Doc. # 85 at 7; Doc. # 94 at 5; Doc. # 97 at 3–5 (citing Doc. # 71-1 at 1045–52).))

20

The interpretation of a contract is a matter of law for the Court to determine. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). The Court's fundamental obligation is to ascertain the parties' intentions, which it attempts to do by looking to the four corners of the document and interpreting its terms consistently with the agreement's overall scheme or plan. *GMC Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779–80 (Del. 2012).

Mr. Kim argues that because the Padeca operating agreement is silent regarding the notice of Board meetings, the contract is ambiguous and, therefore, terms related to the notice and location of, as well as attendance at Board meetings "can be inferred" from the regular conduct of the parties. (Doc. # 79 at 17–18; Doc. # 95 at 4 (citing *Julian v. E. States Constr. Serv.*, 2008 Del. Ch. LEXIS 86, at 21-23 (Del. Ch. 2008)).) In other words, according to Mr. Kim, because the cofounders typically notified each other of Board meetings by posting in their Slack chat (Doc. # 79-1 at 63), by failing to do so for the meetings at which his future involvement in the company was discussed, Mr. Ray and Ms. Kettell violated the Padeca operating agreement. (Doc. # 95 at 4.)

Although "[s]ilence in a contract does not necessarily create ambiguity," *TWA Res. V. Complete Prod. Servs., Inc.*, No. N11C-08-100 MMJ, 2013 WL 1304457, at *9 (Del. Mar. 28, 2013), the parties' course of performance "may be used to aid a court in interpretation of an ambiguous contract, [or] it may also be used to supply an omitted term when a contract is silent on an issue." *Wilmington v. Wilmington FOP Lodge # 1*, No. Civ.A 20244-NC, 2004 WL 1488682, at *7 (Del. Ch. June 22, 2004) (citing Restatement (Second) Of Contracts § 223 & cmt. b. (1979)).

Summary judgment on this claim is not appropriate at this time. The Court notes that the AROAD includes an express provision that "[e]ach Manager shall be given at least two (2) days' prior written notice of any meeting of the Board and will be permitted to participate in any meeting of the Board" (Doc. # 78-1 at 876), and that the parties agree that no such notice of the relevant meetings was provided to Mr. Kim (Doc. # 79-1 at 63, 65). Thus, the parties' dispute regarding which operating agreement was in effect at the time of the alleged breach is material to the determination of the claim. The Court therefore denies both motions as they relate to the Breach of Contract claim.

## D.   BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALINGS

Mr. Kim alleges that multiple actions by Moving Defendants violated the implied covenant of good faith and fair dealings. These include:

- failing to provide Mr. Kim with notice of Board meetings where his future involvement with the company was discussed (Doc. # 79 at 20 (citing Doc. # 79-1 at 64–65));

- seeking advice of counsel to divest Mr. Kim of his equity in the company, resulting in the FURA (*id.*; Doc. # 95 at 6 (citing Doc. # 79-1 at 65, 152–61, 168)); and

- incorporating PolyPort in Delaware on July 5, 2017, without Mr. Kim's knowledge (Doc. # 79 at 21; Doc. # 95 at 6 (citing Doc. # 79-1 at 150, 172)).

Moving Defendants counter that they acted pursuant to the AROAD, FURA, and advice of counsel to repurchase Mr. Kim's unvested shares in the company. (Doc. # 94 at 6 (citing Doc. # 78-1 at 890–91)); *see also* (*id.* at 916–25.) The elements of a claim

for breach of the implied covenant of good faith and fair dealing are: (1) a specific implied contractual obligation; (2) a breach of the obligation; and (3) resulting damage. *Kuroda,* 971 A.2d at 888 (quoting *Fitzgerald v. Cantor*, No. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

Under Delaware law, "[t]he implied covenant of good faith and fair dealing inheres in every contract and requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effects of preventing the other party to the contract from receiving the fruits' of the bargain.'" *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire and Cas. Co*, 878 A.2d 434, 441 (Del. 2005)). It "will only be applied when the contract is truly silent concerning the matter at hand." *Allied Capital Corp. v. GC-Sun Holdings, LP*, 910 A.2d 1020, 1032 (Del. Ch. 2006). Where a contract expressly discusses an obligation, "there is no legal difference between breaches of contract made in bad faith and breaches of contract not made in bad faith. Both are simply breaches of the express terms of the contract." *AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*, No. 4021-VCS, 2009 WL1707910, at *11 (Del. Ch. June 16, 2009). In other words, the same allegedly breaching conduct cannot be both a breach of contract, and a breach of the implied covenant of good faith and fair dealings.

The implied covenant of good faith and fair dealings "should be invoked cautiously and rarely to ensure that parties' reasonable expectations are fulfilled." *Id.* It "'is best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Oxbow*

*Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Dunlap*, 878 A.2d at 441). Even then, the court "should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Oxbow*, 202 A.3d at 507 (quoting *Allied Capital*, 910 A.2d at 1035). "The doctrine . . . operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer. In the Venn diagram of contract cases, the area of overlap is quite small." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

As with the breach of contract claim, the parties' dispute regarding the validity of the AROAD and FURA is material to the determination of this claim. If the AROAD and FURA are valid contracts, the allegedly violating conduct would be covered by express terms of the contract and the implied covenant of good faith and fair dealings would not be applicable. *Dunlap*, 878 A.2d at 441; *Allied Capital*, 910 A.2d at 1032. Therefore, neither Mr. Kim nor the Moving Defendants have established that they are entitled to judgment as a matter of law on this claim.

## E.    BREACH OF FIDUCIARY DUTIES

Under Delaware law, unless limited or eliminated in the entity's operating agreement, the member-managers of a Delaware limited liability company owe traditional fiduciary duties of loyalty and care to the LLC and its members.[11] *See* Del.

---

[11] The Court notes that Mr. Kim brings this claim against all three Moving Defendants including PolyPort. (Doc. # 17 at ¶¶ 100–08.) However, Mr. Kim does not cite to a statute or case holding that an LLC owes fiduciary duties to its managing members, and the Court is not aware of any.

Code Ann. tit. 6, § 18-1101; *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011). Those duties require that the managers exercise their authority on an informed basis in the good faith pursuit of maximizing the value of the corporation for the benefit of its stockholders. *See eBay Domestic Holdings., Inc. v. Newmark*, 16 A.3d 1, 35 (Del. Ch. 2010). The original Padeca operating agreement does not modify or limit the fiduciary duties owed under Delaware law. (Doc. # 79-1 at 82–89.) The disputed AROAD notes only that "[e]ach Manager shall perform his or her duties as such in good faith, in a manner he or she reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances." (Doc. # 78-1 at 874.) Thus, as neither operating agreement limited or eliminated fiduciary duties, and as both operating agreements identified Mr. Kim, Mr. Ray, and Ms. Kettell as managing members of the LLC, Mr. Ray and Ms. Kettell owed fiduciary duties to Mr. Kim under either agreement.

Mr. Kim alleges that Mr. Ray and Ms. Kettell breached their fiduciary duties to him by engaging in wrongful acts including (1) "holding secret meetings in the process of ousting [him] from Padeca"; (2) "excluding [him] from PolyPort"; (3) "fraudulently electronically signing his name to the FURA"; and (4) "misappropriating his innovations and utilizing them after they attempted to oust him from Padeca." (Doc. # 95 at 6 (citing (Doc. # 79-1 at 65, 162, 217–18)); *see also* (*id.* at 95–114, 168, 283.) Moving Defendants do not specifically address these acts. Rather, they counter that their

---

Del. Code Ann. tit. 6, § 18-1101; *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011). Therefore, the Court construes this as a claim against Mr. Ray and Ms. Kettell only.

managerial decisions are protected by the business judgment rule, and that they sought and reasonably relied on the advice of counsel related to Mr. Kim's future involvement with the company. (Doc. # 94 at 7; Doc. # 97 at 6–7.) These arguments appear to be focused on the fiduciary duties Mr. Ray and Ms. Kettell owed to the corporation itself, rather than to Mr. Kim as a fellow manager. *Compare* (Doc. # 95 at 6), *with* (Doc. # 94 at 7; Doc. # 97 at 6–7.)

The undisputed material facts demonstrate that Mr. Kim was removed from D3CRYPT3D's leadership following Board meetings of which he was not informed. (Doc. # 79-1 at 63, 65.) However, Mr. Kim's apparent allegations that these actions were motivated by some incentive other than the best interest of the company are conclusory and do not constitute competent summary judgment evidence. *Bones*, 366 F.3d at 869. Additionally, the factual dispute regarding how Mr. Kim's signature was affixed to the AROAD and FURA requires credibility determinations which the Court cannot engage in at the summary judgment phase. *Allen*, 118 F.3d at 839. In summary, the Court concludes that neither party has met its burden to demonstrate that judgment as a matter of law is appropriate on Mr. Kim's breach of fiduciary duties claim and the Court denies both Motions as they relate to this claim. *Anderson*, 477 U.S. at 256; *Bones*, 366 F.3d at 869; *Adler*, 144 F.3d at 671.

## F.   MISAPPROPRIATION OF BUSINESS IDEAS

Mr. Kim argues that Mr. Ray and Ms. Kettell misappropriated his ideas of means to protect 3D assets, which he asserts constituted trade secrets. He alleges this misappropriation occurred through the use of Mr. Kim's ideas in (1) the '388 Patent,

which did not name Mr. Kim as an inventor, and (2) the most recent PolyPort suite of software. (Doc. # 79 at 23–24; Doc. # 95 at 6–7.)

To prove trade secret misappropriation under the DUTSA, the plaintiff must demonstrate that: "(1) a trade secret exists; (2) the plaintiff communicated the secret to the defendant; (3) there was an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information was improperly used or disclosed to the injury of the plaintiff." *Elenza, Inc. v. Alcon Labs. Holding Corp.*, 183 A.3d 717, 721 (Del. 2018).

> To show the existence of a trade secret, a plaintiff must allege that the information "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and that the information is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

*AlixPartners, LLP v. Benichou*, 250 A.3d 775, 782 (Del. Ch. 2019) (quoting Del. Code Ann. tit. 6, § 2001(4)). Some means by which a plaintiff can demonstrate that he took reasonable steps to guard the secrecy of his trade secret include requiring a confidentiality agreement and/or acceptable use policy, use of passwords, and restricting rights and access to individuals with a need to know. *Id.*

Mr. Kim has not demonstrated his ideas for protecting 3D assets were "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy." Del. Code Ann. tit. 6, § 2001(4). There are no confidentiality, restricted rights, or acceptable use policies or agreements in the record. Further Mr. Kim's ideas were disclosed prior to the alleged misappropriations in the provisional patent application filed July 4, 2016—which did list Mr. Kim as an inventor (*id.* at 5–9)—as well as at the SXSW

event in March 2017 (*id.* at 92.) Finally, Mr. Kim testified that he "told [Mr. Ray] this idea [of hiding a signature created from polygons inside 3D assets] and . . . that's where [Mr. Ray] goes, . . . 'We could use encryption for this.'" (Doc. # 78-1 at 31.) Mr. Ray testified that he and Mr. Kim were discussing music theft when Mr. Kim mentioned that because 3D assets were also frequently stolen, he would hide a type of signature in a polygon. (*Id.* at 251.) These conversations indicate that, rather than seeking to maintain the secrecy of his ideas, Mr. Kim freely discussed his work related to the protection of 3D assets. After carefully reviewing the evidence presented by both parties, the Court finds that Defendants have established that they are entitled to judgment as a matter of a law on Mr. Kim's misappropriation claim. As such, the Court grants Moving Defendants' Motion, and denies Mr. Kim's Motion, as they relate to this claim.

## G.     IIED

Mr. Kim alleges that outrageous conduct intentionally or recklessly engaged in by Mr. Ray and Ms. Kettell—including (1) holding secret meetings (2) "cut[ting] off meaningful communication with Mr. Kim while secretly plotting to oust him," (3) taking his business ideas and promoting them as his own, (4) reducing Mr. Kim's ownership interest in the company, and (5) fraudulently signing his name to documents and checks—caused him severe emotional distress resulting in a hospitalization and treatment by a psychologist. (Doc. # 79 at 25; Doc. # 83 at 19–20; Doc. # 95 at 7–8.)[12]

---

[12] Mr. Kim also argues that "the intensity of conduct" he needs to establish is lower because Mr. Ray and Ms. Kettell, "as managing members of Padeca, had substantial control over Mr. Kim when they orchestrated his ousting." (Doc. # 86 at 9.) However, Mr. Kim cites only Colorado case law in making this argument (*id.*), therefore the Court does not consider it.

Moving Defendants counter that the conduct complained of is insufficiently "outrageous" to form the basis of a claim for IIED and that Mr. Kim's evidence does not establish that their actions caused his emotional distress. (Doc. # 78 at 23–25; Doc. # 81 at 12–14; Doc. # 85 at 9–10; Doc. # 94 at 9; doc. # 97 at 9–10.) Viewing the evidence in the light most favorable to Mr. Kim, the Court agrees that Mr. Kim has not presented evidence of sufficiently "outrageous" conduct.

To prevail on a claim for IIED under Delaware law, a plaintiff must establish "(1) extreme and outrageous conduct; (2) an intent of causing severe emotional distress or reckless disregard with respect to causing emotional distress; and (3) the conduct actually caused severe emotional distress." *Jordan v. Delaware*, 433 F. Supp. 2d 433, 444 (D. Del. 2006) (quoting *Capano Mgmt. Co. v. Transcon. Inc. Co.*, 78 F. Supp. 2d 320, 327 (D. Del. 1999)). With respect to the first element, the Supreme Court of Delaware has defined outrageous conduct as behavior, "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citing *Mattern v. Hudson*, 532 A.2d 85, 86 (Del. 1987)). Although the question of whether conduct is outrageous is generally a question for the factfinder, the Court may dismiss a claim if it finds that reasonable minds could not differ on the question. *Hunt ex rel. DeSombre v. State*, 69 A.3d 360, 367 (Del. 2013).

Even viewing the facts in the light most favorable to Mr. Kim, the Court finds that Mr. Ray and Ms. Kettell's actions during the final months of Mr. Kim's work with the company did not amount to extreme and outrageous conduct or conduct exceeding "all

possible bounds of decency" as outlined by Delaware case law. Therefore, the Court concludes that Moving Defendants are entitled to summary judgment on Mr. Kim's IIED claim and the Court will grant Moving Defendants' motion (Doc. # 78) and deny Mr. Kim's (Doc. # 79) with respect to this claim.

## H.    AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

Mr. Kim alleges that PolyPort, "by actions taken by its Board leadership," and Mr. Shull aided and abetted Mr. Ray and Ms. Kettell's breaches of fiduciary duties owed to Mr. Kim as a co-manager of Padeca/D3CRYPT3D/PolyPort. (Doc. # 79 at 25–26; Doc. # 95 at 9.) To prevail on a claim for aiding and abetting breach of fiduciary duty under Delaware law, a plaintiff must establish: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Stewart v. Willimgton Trust SP Servs., Inc.*, 112 A.3d 271, 320 (Del. Ch. 2015) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)). "'Knowing participation' involves two concepts: knowledge and participation. The knowledge or scienter component requires that the plaintiff demonstrate the third party "had actual or constructive knowledge that their conduct was legally improper." *New Enter. Assoc. 14, LP v. Rich*, 292 A.3d 112, 175 (Del. 2023) (citing *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015)). "[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to prove." *RBC*, 129 A.3d at 865–66. To satisfy the requirement of participation, Mr. Kim must establish that PolyPort and/or Mr. Shull

"participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue." *Malpiede*, 780 A.2d at 1098.

Mr. Kim cites no evidence to establish the "knowing participation" element. (Doc # 79 at 26; Doc # 83 at 20; Doc # 86 at 9; Doc # 95 at 9; Doc # 96 at 8–9.) Rather, he conclusively states that "PolyPort, through its Board, aided and abetted the breach of fiduciary duties [committed by Mr. Ray and Ms. Kettell] owed to Mr. Kim. PolyPort is thus liable." (Doc. # 79 at 26; Doc. # 96 at 9.) Because conclusory statements do not constitute competent summary judgment evidence, Mr. Kim had not met his burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Bones* v, 366 F.3d at 875. Accordingly, the Court will grant Moving Defendants' motion and deny Mr. Kim's motion as they relate to this claim.

## I.   DECLARATORY JUDGMENT

Finally, Mr. Kim requests the Court "enter a declaratory judgment that [he] owns thirty-three percent of PolyPort." (Doc. # 79 at 26; Doc. # 95 at 8.) The parties' material dispute regarding the validity of the AROAD and FURA prevent summary judgment on this claim. However, Mr. Kim argues that even if his signature on the FURA was authentic, the document is unconscionable, and therefore unenforceable, because the repurchase option amounts to self-harm. (Doc. # 78 at 28–29; Doc. # 95 at 10–11.)

Unconscionability under Delaware law, a "concept that is used sparingly," *Ketler v. PFPA, LLC*, 132 A.3d 746, 748 (Del. 2016), requires the party asserting it to demonstrate both procedural and substantive unconscionability. *Rummel Klepper & Kahl, LLP v. Del. River & Bay Auth.*, No. 2020-0458-PAF, 2022 WL 29831, at *14 (Del.

Ch. Jan. 3, 2022) (citing *Chemours Co. v. DowDuPont Inc.*, No. 2019-0351-SG, 2020 WL 1527783, at *12 (Del. Ch. Mar. 30, 2020)). Procedural unconscionability revolves around the "procedures that led to the contract with the goal of evaluating whether seemingly lopsided terms might have resulted from arms'-length bargaining," as well as a "focus on the relative bargaining strength of the parties and whether the weaker party could make a meaningful choice." *Id.* (quoting *Chemours*, 2020 WL 1527783, at *12). Substantive unconscionability, on the other hand, requires a finding of "terms evidenc[ing] a gross imbalance that shocks the conscience or if the bargain is on terms so extreme as to appear unconscionable according to the mores and business practices of the time and place." *Id.* (internal quotations omitted). There are insufficient undisputed material facts in the record regarding the procedures that led to the AROAD and FURA for the Court to determine these documents are unconscionable as a matter of law. Accordingly, the Court denies both Motions as they relate to Mr. Kim's request for Declaratory Judgment.

## IV.  **CONCLUSION**

Based on the foregoing, the Court ORDERS as follows:

- Plaintiff Andrew Dosa Kim's Correction of Inventorship Claim is DISMISSED WITHOUT PREJUDICE for lack of jurisdiction as it relates to the '991 Application.[13]

---

[13] A dismissal for lack of jurisdiction should be without prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006).

- Plaintiff Andrew Dosa Kim's Motion for Summary Judgment (Doc. # 79) is GRANTED IN PART AND DENIED IN PART. It is GRANTED with respect to Plaintiff's Correction of Inventorship claim as it relates to United States Patent number 10,713,388 B2. It is DENIED in all other respects.

- Defendants Chloe Kettell, Partha Ray, and PolyPort, Inc.'s Motion for Summary Judgement (Doc. # 78) is GRANTED IN PART AND DENIED IN PART. It is GRANTED with respect to Plaintiff's claims for Misappropriation of Business Ideas against all Defendants, Intentional Infliction of Emotional Distress against Ms. Kettell and Mr. Ray, and Aiding and Abetting Breach of Fiduciary Duty against Mr. Shull and PolyPort. It is DENIED in all other respects.

DATED: September 26, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge